# 13-3119-cr(L),

### 13-3121-cr(CON), 13-3296-cr(CON), 14-1845-cr(CON), 14-1857-cr(CON),14-1859-cr(CON)

# United States Court of Appeals
## for the
# Second Circuit



UNITED STATES OF AMERICA,

*Appellee,*

– v. –

GARY HEINZ, MICHAEL WELTY, PETER GHAVAMI,

*Defendants-Appellants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## FINAL FORM REPLY BRIEF FOR
## DEFENDANT-APPELLANT PETER GHAVAMI

NATHANIEL Z. MARMUR
BALLARD SPAHR STILLMAN & FRIEDMAN, LLP
425 Park Avenue
New York, New York 10022
(212) 223-0200

*Attorneys for Defendant-Appellant
Peter Ghavami*

*Of Counsel:*
CHARLES A. STILLMAN
JAMES A. MITCHELL
MARY MARGULIS-OHNUMA

# **<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ................................................................ ii

ARGUMENT ..................................................................................1

POINT I:      THE PROSECUTION WAS TIME BARRED ...................................1

   A.  Waiver ...............................................................................1

   B.  The Merits ...........................................................................9

POINT II:     THE ADMISSION OF PRIOR BAD ACTS EVIDENCE WAS
PREJUDICIAL ERROR ......................................................20

POINT III:    THE ADMISSION OF LAY TESTIMONY
INTERPRETING CONSENSUAL RECORDINGS
WAS PREJUDICIAL ERROR ...........................................27

POINT IV:     THE DISTRICT COURT ERRED IN DENYING THE
MOTION FOR A NEW TRIAL ........................................28

CONCLUSION ................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

1256 Hertel Ave. Assoc's, LLC v. Calloway,
    761 F.3d 252 (2d Cir. 2014) ...............................................................20

Almendarez-Torres v. United States,
    523 U.S. 224 (1998)..............................................................19 n. 6, 20 n. 6

Anza v. Ideal Steel Supply Corp.,
    547 U.S. 451 (2006)................................................................ 6-7, 12

E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.,
    241 F.3d 154 (2d Cir. 2001) .........................................................8 n. 3

Estate of Sanford v. Comm'r of Internal Revenue,
    308 U.S. 39 (1939)........................................................................7 n. 2

In re Wellcare Health Plans, Inc.,
    754 F.3d 1234 (11th Cir. 2014) ...................................................11, 16

Lotes Co. v. Hon Hai Precisions Indus. Co.,
    753 F.3d 395 (2d Cir. 2014) ..........................................................14

Ouimette v. E.F. Hutton & Co.,
    740 F.2d 72 (1st Cir. 1984)..............................................................9

People v. Peters,
    180 Ill. App. 3d 850, 536 N.E.2d 465 (App. Ct. Ill. 1989) ...............................11

Peoples Bank & Trust Co. v. Aetna Ca. & Sur. Co.,
    113 F.3d 629 (6th Cir. 1997) ..........................................................13

Sinicropi v. Milone,
    915 F.2d 66 (2d Cir. 1990) ..............................................................7

Swift & Co. v. Hocking Valley Ry.,
    243 U.S. 281 (1917)........................................................................7 n. 2

United States v. Amato,
   540 F.3d 153 (2d Cir. 2008) .................................................................15, 15 n. 5

United States v. Archer,
   671 F.3d 149 (2d Cir. 2011) .................................................................16

United States v. Avila,
   733 F.3d 1258 (10th Cir. 2013) ...........................................................8

United States v. Bass,
   404 U.S. 336 (1971)..............................................................................19, 20

United States v. Benson,
   79 Fed. Appx. 813 (6th Cir. 2003).......................................................11

United States v. Borden Co.,
   370 U.S. 460 (1962).............................................................................8 n. 3

United States v. Bouyea,
   152 F.3d 192 (2d Cir. 1998) ................................................................14

United States v. Buchanan,
   59 F.3d 914 (9th Cir. 1995) .................................................................8

United States v. Craft,
   105 F.3d 1123 (6th Cir. 1997) .............................................................6

United States v. Garib-Bazain,
   222 F.3d 17 (1st Cir. 2000)..................................................................5

United States v. Mercado,
   573 F.3d 138 (2d Cir. 2009) ...............................................21, 22, 23, 25

United States v. Ojeikere,
   545 F.3d 220 (2d Cir. 2008) ................................................................16

United States v. Olano,
   507 U.S. 725 (1993)..............................................................................7

United States v. Pitre,
   960 F.2d 1112 (2d Cir. 1992) ..............................................................22

United States v. Rodriguez-Gonzalez,
   899 F.2d 177 (2d Cir. 1990) ................................................................9

United States v. Vebeliunas,
   76 F.3d 1283 (2d Cir. 1996) ...............................................................6

United States v. Weiss,
   7 F.3d 1088 (2d Cir. 1993) ................................................................5

United States v. Yannotti,
   541 F.3d 112 (2d Cir. 2008) ............................................................27

**FEDERAL STATUTES**

18 U.S.C. § 3293(2) ...........................................................................passim

18 U.S.C. § 3663A(2) ..............................................................................15

18 U.S.C. § 3663A(b)(4)...............................................................15 n. 5, 17

**RULES**

Fed. R. Evid. 403 ...................................................................................23

Fed. R. Evid. 404(b)................................................................................23

Fed. R. Evid. 701 ...................................................................................28

**OTHER AUTHORITIES**

Alyssa King, Comment, The Protection of Deposits and Depositors, a
   Limited Interpretation of 12 U.S.C. §1833a, 63 Cath. U.L. Rev. 759
   (Spring 2014) ...............................................................................13, 17

Christopher M. Matthews, Federal Prosecutors Emerge From Mortgage-
   Fraud Trial with New Weapon, Wall Street Journal, October 23, 2013 ...........18

Topetzes and Ricciuti, Expanded Use of FIRREA Means New Challenges
   for Financial Institutions, 27 No. 19 Westlaw J. Del. Corp. 1 (April 1,
   2013) .............................................................................................18

# ARGUMENT

Defendant-Appellant Peter Ghavami respectfully submits this reply brief in further support of his appeal.

## POINT I

## THE PROSECUTION WAS TIME BARRED

### A.    Waiver

The government claims that a trial stipulation "precludes" our statute of limitations argument.  The government is wrong, and this Court should decide the merits of the issue.

1.    The procedural background is as follows:  The district court denied Defendants' pretrial motion to dismiss the Indictment as untimely, ruling that the financial institutions here were "affect[ed]" under 18 U.S.C. §3293(2).  It held that the charged conduct "expos[ed] them to the risk of financial loss and caus[ed] them to experience actual financial loss" in "the form of civil monetary settlements" with the SEC and other regulators, as well as in the form of "attorneys' costs and fees associated with reaching resolutions of non-prosecution agreements" with the Department of Justice. (SPA75-76). The government had proffered those settlement and non-prosecution agreements as evidence it would offer at trial to prove the "affects" requirement.  See  (SPA80-83).

Defendants did not dispute the existence of these agreements. Rather, they argued that the evidence was insufficient <u>as a matter of law</u> to satisfy the "affects" requirement.  In their view, the agreements did not reflect the <u>type</u> of harm to a financial institution contemplated by Section 3293(2) because the causal link between the offenses and the payments was too attenuated.  <u>See</u>  (SPA76) (noting Defendants' argument that agreements were "insufficient to demonstrate a direct relationship between the charged conduct and the effects on the financial institutions that entered into those agreements"); Defendants' Reply Memorandum of Law In Support of Their Joint Motion for Dismissal, at 1 (A308) (positing a "multitude of reasons that financial institutions enter such settlements that are unrelated to the merits of the government's allegations").

The district court disagreed, giving the statutory language a broad interpretation that would apply even where the institution itself is an active participant in the fraud. (SPA76-77). Thus, it held, "[t]he statute's applicability is not limited to circumstances in which a financial institution is the object or victim of a scheme to defraud." (SPA76). The court also "interpret[ed] §3293(2) to cover conduct that exposes a financial institution to a new or increased risk of loss." (SPA78). As a result, it held that the agreements were the type of harm the statute contemplated. (SPA84-85).

2

The court went even further. Having found the documentary evidence (together with testimony proffered by the government) "sufficient" to prove the "affects" requirement, it held that "Defendants need not inquire into other potential reasons that may have motivated the [institutions'] decision to enter into those agreements, thereby eliminating the need for supplemental discovery and cross-examination of the representatives into . . . collateral issues." (SPA85). In other words, the evidence was not merely <u>sufficient</u> to satisfy Section 3293(2), but it was largely <u>conclusive</u> of the question presented. <u>See</u> (SPA84) (rejecting Defendants' argument that they should "be able to probe . . . the [institutions'] intent behind entering into [the agreements]").

2. Nevertheless, to address the prejudice from admitting this evidence, the court invited the parties to "stipulate that the alleged conduct affected a financial institution." (SPA86 n.9). Defendants' proposed stipulation included a reservation of rights (which the government resisted) relating to "the subject of [Defendants'] motion." (A969). Indeed, the defense repeatedly stated that any stipulation must allow it to appeal the court's pretrial ruling on the limitations issue. <u>See, e.g.,</u> (A1122) (defense counsel: "[W]e of course need to reserve our rights with respect to our arguments and our motions <u>as to the applicability of the</u> <u>statute in and of itself</u>. . . . So it's just a question of preserving <u>the legal arguments</u> and the things in our motion papers.")(emphasis added).

The court acknowledged the point and agreed that any stipulation did not waive Defendants' right to appeal. For example, when the defense reiterated that it was stipulating "with the understanding that we're preserving our rights with respect to our arguments," the court responded: "I know you want to do that. To me that made sense. I haven't yet heard from the government why you should have to give up that appeal point." (A1175). Likewise, when the defense clarified that it was not seeking to preserve a factual issue of sufficiency of proof at trial, but only "the legal arguments we made in our motion," the court responded: "I know that." (A1175). See also (A1175) (court to prosecutor: "They lost. They want the right to appeal. If I'm wrong, they'll succeed on appeal."). And it concluded that it could not "imagine there's any support" for the government's assertion that Defendants will have "waived that right by stipulating." (A1175).[1]

When the parties submitted the signed stipulation, the court immediately confirmed its understanding that Defendants had fully preserved the issue for appeal:

> [Defense Counsel] MR. MITCHELL: Just, your Honor, at long last I'm prepared to pass up to your Honor the stipulation signed on the settlements, subject of course to our reservation of rights in the motions we made. . . .

---

[1] In fact, the government subsequently confirmed that it "ha[d] found no case law on point." (A392). In response, Defendants reiterated that any "concession/stipulation will be made only with a reservation of [Defendants'] right to appeal the issues raised in their pretrial motion papers." (A394).

[Defense Counsel] MR. MUKASEY:  I'm not sure if I heard Mr. Mitchell say we are preserving our rights.

MR. MITCHELL:  Yes.  We are preserving our rights.

THE COURT:  You don't ever have to say it again.  It's preserved.

(A1205).

3.    The statute of limitations defense is fully preserved here because:  (a) the district court denied Defendants' motion to dismiss on a question of law, which remains unaffected by the stipulation; and (b) in any event, Defendants reserved their rights to raise the issue on appeal, in fact relying on the district court's statement that they would be able to do so.

It is well established that, following a conviction, a defendant can appeal an order denying a pretrial motion to dismiss an indictment on statute of limitations grounds.  <u>See</u> <u>United States v. Weiss</u>, 7 F.3d 1088, 1090 (2d Cir. 1993)(noting that such orders are "reviewable on an appeal from a final judgment"); <u>see also</u> <u>United States v. Garib-Bazain</u>, 222 F.3d 17, 18-19 (1st Cir. 2000)("the statute of limitations is an ordinary defense and it can fully and fairly be vindicated by appeal after a final judgment").  The government seeks to avoid the import of this rule by claiming that Defendants waived their right to challenge the timeliness of the indictment on appeal by stipulating to the sufficiency of the evidence on the "affects a financial institution" element.

5

In making this claim, the government fails to recognize the distinction between the <u>legal</u> argument advanced in Defendants' pretrial motions (that, as a matter of law, the word "affects" in Section 3293(2) was not satisfied here because the harms to the banks were too attenuated) and the <u>factual</u> concession Defendants made at trial (that, accepting the court's interpretation of the statute as the law of the case, the evidence proffered was sufficient to satisfy the statute). For Defendants to have put the government to its burden of proof at trial after losing the legal battle over the meaning of the statute would have done little more than waste time for the parties, the witnesses, the court and the jurors. What remained after the adverse ruling on the pretrial motions was a question of law that could be remedied only through appeal. <u>See</u> <u>United States v. Vebeliunas</u>, 76 F.3d 1283, 1292 (2d Cir. 1996)("[W]e do not believe that [defendant] waived the limitations defense by failing to request a jury instruction on the issue. His limitations argument is premised upon a legal position that he had argued unavailingly to the district court in a pretrial motion."); <u>United States v. Craft</u>, 105 F.3d 1123, 1127 (6th Cir. 1997)(where "the facts relating to the disposition of the statute of limitations issue are . . . essentially undisputed," they "raise a legal issue, not a factual one"). <u>See also</u> <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451

(2006)(whether chain of events was too attenuated to constitute proximate cause was issue of law).[2]

        4.     In any event, Defendants' repeated assertion that they had preserved their argument for appeal was the very antithesis of waiver, which is the intentional relinquishment of a known right.  See United States v. Olano, 507 U.S. 725, 733 (1993).  The government seeks to undermine this point by claiming that Defendants offered only "vague" and "unilateral" statements on preservation, Gov't Br. at 36, but that claim is not faithful to the record, as set forth above. Likewise, the government's claim that the court endorsed Defendants' position only "after the defendants submitted the signed stipulation," id. at 37 (emphasis added), paints a misleading portrait of what occurred here.  The district court validated Defendants' position throughout the proceedings, indeed ultimately

---

[2]     Indeed, the government's position runs afoul of the settled principle that parties cannot stipulate so as to preclude a court's determination on a question of law.  See Estate of Sanford v. Comm'r of Internal Revenue, 308 U.S. 39, 51 (1939) ("We are not bound to accept, as controlling, stipulations as to questions of law."); Sinicropi v. Milone, 915 F.2d 66, 68 (2d Cir. 1990)(same)(citing Sanford). The government also inexplicably asserts that, "[b]ecause the defendants waived any argument that the facts were other than as stipulated, any legal arguments they raise about the scope of §3293(2) are moot."  Govt. Br. at 38 (emphasis added). Although this statement is a linchpin to the government's waiver argument, it is unsupported by any legal citation, and the authority is to the contrary.  See Swift & Co. v. Hocking Valley Ry., 243 U.S. 281, 289 (1917)("[i]f the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law").

expressing frustration that the point was being repeated so often. (A1205) ("You don't ever have to say it again. It's preserved."). Moreover, the stipulation was received into evidence and read to the jury well <u>after</u> the court made its pronouncement that the issue was preserved.[3]

It is also worth noting that Defendants <u>relied</u> upon the district court's recognition that they had preserved the issue for appeal. Had Defendants thought their appellate rights were being compromised, they could have refused to stipulate, and that is precisely what they told the court they would do. <u>See</u> (A394-95) ("defendants further take the position that their concession/stipulation will be made only with a reservation of their right to appeal the issues raised in their pretrial motion papers"). Where, as here, jurisdictional issues are not in play, defendants are entitled to rely on statements of a district judge about their ability to appeal an adverse ruling. <u>See, e.g.</u>, <u>United States v. Avila</u>, 733 F.3d 1258, 1259-60 (10th Cir. 2013)(vacating plea where judge erroneously told defendant he retained right to appeal); <u>United States v. Buchanan</u>, 59 F.3d 914, 917-18 (9th Cir. 1995)("[b]ecause of the district court judge's statements, [defendant] could have a

---

[3]    <u>See</u> <u>United States v. Borden Co.</u>, 370 U.S. 460, 462 n.3 (1962)("[a]t the time the stipulation was proposed, the trial court made it quite clear that the Government by so stipulating was not waiving its right to argue the [point on appeal]"); <u>E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.</u>, 241 F.3d 154, 167 (2d Cir. 2001)(holding that stipulation did not waive argument where "the district court expressly acknowledged [defendants'] objection to the evidentiary ruling and recited that they had preserved their right to appeal that ruling notwithstanding the stipulation").

reasonable expectation that he could appeal his sentence. . . .  Litigants need to be able to trust the oral pronouncements of district court judges."); <u>Ouimette v. E.F. Hutton & Co.</u>, 740 F.2d 72, 76 (1st Cir. 1984)(reaching merits of issue where "the trial judge did state that he would preserve the parties' objections and they relied on the court's statements").[4]

5. Finally, a finding of waiver would serve no sound juridical purpose.  The waiver rules are intended to insure that a party "fairly alerts the court and opposing counsel to the nature of the claim."  <u>United States v. Rodriguez-Gonzalez</u>, 899 F.2d 177, 180 (2d Cir. 1990).  That is what occurred here.  There was full briefing on the legal issue; the government made a thorough factual record (through documents and proffers of testimony); and the district court issued a decision on the merits.  Under these circumstances, this Court should address the critical question of law that is fully and sharply presented for review.

## B. <u>The Merits</u>

The government fares no better addressing the merits of the limitations issue.  Any sound reading of Section 3293(2) demonstrates that the

---

[4] For similar reasons, the government's contractual approach to interpreting the stipulation fails.  Plea agreements are also subject to contract principles, but, as these cases make clear, appellate courts <u>do</u> look at "parol" statements by the district judge in determining whether a litigant may appeal an issue otherwise waived.

financial institutions here were "affected" not by the underlying offense conduct, but by the investigation and prosecution of the offenses years later.

1. The government begins with the claim that "risk of loss" is sufficient to trigger the extended limitations period, Gov't Br. at 42-43, but that is beside the point. The "risk" here -- that the banks would incur costs as a result of criminal or regulatory action -- materialized into actual loss when the banks made payments pursuant to the settlement and non-prosecution agreements. The relevant question is whether those costs are the type of harm contemplated by the statute. If we are correct that such downstream consequences of the banks' own criminal actions are not sufficient to satisfy Section 3293(2), then surely the risk that those consequences would occur cannot be sufficient either.

2. The government argues that the word "affects" in Section 3293(2) encompasses the costs to the banks associated with entering into those agreements. That interpretation is inconsistent with the natural meaning of the word "affects," its placement in Section 3293(2) immediately after the word "offense," the liberal interpretation to be given statutes of repose, and the rule of lenity.

Section 3293(2) provides that a "person" is subject to the extended limitations period only "if the offense affects a financial institution." The "persons" here are the individual defendants, but could just as easily be the

financial institutions that were unindicted co-conspirators. This does not deter the government, which advances the novel concept that UBS, through its fraudulent actions against others, ultimately affected <u>itself</u>. The government cannot identify any case in which a criminal statute was so bizarrely interpreted to mean that the defendant was also the person sought to be protected, and any sensible construction of the law would surely compel the opposite result. <u>See, e.g.</u>, <u>In re Wellcare Health Plans, Inc.</u>, 754 F.3d 1234, 1239 (11th Cir. 2014)(under restitution statute "a perpetrator cannot be his own victim"); <u>People v. Peters</u>, 180 Ill. App. 3d 850, 854, 536 N.E.2d 465, 468 (App. Ct. Ill. 1989)(an "attempted murder statute would not apply to attempted suicide").

Even if the banks, despite being unindicted co-conspirators, are treated as distinct from the individual defendants, the "harm" they suffered by settling criminal and regulatory cases still cannot be viewed as the "effect" of their employees' crimes, which, after all, were directed at municipalities and designed to <u>benefit</u> the banks. At most, the banks were affected by the subsequent <u>discovery and prosecution</u> of those crimes, and not by the crimes themselves. <u>See United States v. Benson</u>, 79 Fed. Appx. 813, 829 (6th Cir. 2003)(unpublished decision)(interpreting similar language in sentencing guidelines and holding that bank was not "affected" when it was sued by trustee to recover funds deposited by

defendant, since defendant's "sentence should not be enhanced because of the voluntary actions of a non-conspirator [the trustee]").

Two hypotheticals illuminate the point. Assume a senior bank executive, on his own time, runs a Ponzi scheme to defraud others. Would the government argue that the offense "affected" the bank? After all, if the defendant is caught and incarcerated -- a natural and probable consequence of the criminal act, in the government's view -- he can no longer perform his important job. And if a statute made it unlawful to commit a fraudulent act that "affects the administration of justice," would the government argue that the same Ponzi scheme met this definition because the defendant's arrest, prosecution and incarceration imposed costs on the judicial system? Surely no court would uphold such a conviction on that theory. As related to the offense, those harms are collateral or consequential, and not direct and proximate. See, e.g., Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006)(competitor's sales tax fraud, which cheated the state out of revenue and allowed it to charge lower prices, did not proximately cause plaintiff's lost sales).

Moreover, the placement of the word "affects" immediately after the word "offense" in Section 3293(2) removes any possible doubt that it refers to the immediate consequences of the crime and not to the downstream ripples caused by the discovery and prosecution of that crime. As one commentator aptly noted:

12

> The natural reading of the statutory provision requires that the enumerated crime cause the effects to the . . . financial institution. The subject, the enumerated crimes, must affect the object, the . . . financial institutions. As a transitive verb, 'affect' must link the subject and the object. Therefore, the enumerated crime itself, not the action taken by the prosecutorial authority, must cause the effects on the . . . financial institution.

Alyssa King, Comment, <u>The Protection of Deposits and Depositors, a Limited Interpretation of 12 U.S.C. §1833a</u>, 63 Cath. U.L. Rev. 759, 782 n. 200 (Spring 2014)(citations omitted).

For this reason, the most natural reading of the statute is that it applies when one defrauds a bank, thereby causing direct harm when the institution pays out funds it may never recover (or perhaps when an innocent bank suffers collateral damages as a result of being used in another's fraud). But where the bank pays to remedy its own culpable conduct, the causative chain is far too attenuated. Take what happened here: The banks, through their executives, conspired to defraud municipalities; the fraud was discovered; the regulators investigated the facts and evaluated whether criminal and/or civil actions could be sustained against the banks; those actions were brought or threatened; the banks determined whether there was sufficient exposure; the banks agreed to settle; and, nearly ten years after the offenses, the banks paid out funds. <u>See</u> <u>Peoples Bank & Trust Co. v. Aetna Ca. & Sur. Co.</u>, 113 F.3d 629, 635 (6th Cir. 1997)(rejecting argument that the "natural and probable consequences" of bank executives' fraud

13

on borrowers was that victims would sue bank and recover; "while there was nothing unnatural" about that recovery, "we cannot say it was probable" in light of the many intervening "contingencies").

        3.    Although this Court has not ruled on this precise issue, it acknowledged in United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998) -- by its use of the "sufficiently direct" language -- that the statute necessarily embodies causation principles that limit the breadth of the word "affects."  The government argues that Bouyea did not enunciate a causation standard, but "simply conveyed that the proven effect sufficed."  Gov't Br. at 48.  Left without a controlling standard, the government proposes one that is for all intents and purposes the same as Bouyea's, namely whether the harm qualifies under "traditional causation" principles such as "reasonabl[e] proxim[ity]."  Id. at 48-49 (quoting Lotes Co. v. Hon Hai Precisions Indus. Co., 753 F.3d 395, 410 (2d Cir. 2014));  See also id. at 49 (explaining that, under Lotes, "'direct' can denote 'proximate'").

        Applying that standard, the government argues that "[t]he Bank Agreements . . . were proximately caused by the defendants' crimes" since "[l]egal penalties [for the corporation] are reasonably foreseeable when a corporate employee commits a crime within the scope of his employment," as well as "legal costs, including attorneys' fees, in defending itself and assisting the government."  Id.  The government supports this proposition with little more than a general

discussion of proximate causation and a "cf." cite to United States v. Amato, 540 F.3d 153, 162 (2d Cir. 2008), in which this Court held that an employer was entitled to restitution for its internal investigative costs triggered by the prosecution of its employees.

The government can take no refuge in Amato. That case interpreted the Mandatory Victims Restitution Act of 1996 ("MVRA") and, when properly read (along with other restitution cases), it demonstrates that the bank costs here were not proximately caused by offense conduct. The defendants in Amato were executives who deceived the company into believing they had achieved performance targets and thereby unlawfully received bonuses. It is no surprise, then, that the company was considered a "victim" of the offense under the MVRA. See 18 U.S.C. §3663A(2)(defining "victim" as "a person directly and proximately harmed as a result of the commission of an offense").[5]

Here, by contrast, the criminal conduct was directed at others (the municipalities), and the banks were culpable actors. The government ignores this distinction, and in doing so erroneously concludes that the harm to the banks in the form of settlement costs was a "reasonably foreseeable" consequence of their own

---

[5]     Moreover, the Amato Court was interpreting 18 U.S.C. § 3663A(b)(4), which requires a district court to order a defendant to "reimburse the victim for . . . other expenses related to participation in the investigation or prosecution of the offense," a clear statutory directive that ties legal costs and attorneys' fees to the victim's cooperation with the authorities.

15

underlying criminal conduct. This argument, if accepted, would lead to the conclusion that UBS and the other banks were "victims" of the fraud and thus entitled to restitution under the MVRA as ones "directly and proximately harmed as a result of the commission of an offense." Simply to state this proposition is to recognize that it cannot be true. See In re Wellcare Health Plans, Inc., 754 F.3d at 1236 (affirming district court's holding that company was "harmed collaterally but not directly," and thus was not "victim" under MVRA, where company admitted in deferred prosecution agreement to engaging in fraud against Florida healthcare programs through acts of its employees, and agreed to pay $80 million in restitution and civil forfeiture); see also United States v. Archer, 671 F.3d 149, 169-74 (2d Cir. 2011)(individuals were not entitled to restitution to the extent they were defendant's co-conspirators rather than his victims); United States v. Ojeikere, 545 F.3d 220, 223 (2d Cir. 2008)("restitution would not be appropriate if one burglar were to rob another of the proceeds of a heist they have just committed").

If anything, the MVRA demonstrates that Congress knows how to distinguish between the consequences of an offense and the consequences of proceedings resulting from the discovery and prosecution of an offense. Section 3663A(b)(2)(C) requires a court to order the defendant who causes bodily injury to another to "reimburse the victim for income lost by such victim as a result of such

16

offense." Section 3663A(b)(4) goes further; it requires a court to order the defendant, in any case, to "reimburse the victim for lost income [and other expenses] <u>incurred during participation in the investigation and prosecution of the offense or attendance at proceedings related to the offense</u>." (Emphasis added). Under the government's view, the underscored language would be superfluous (or at least grossly overwritten), since Congress could just as easily have used the clause "as a result of such offense" -- as it did in the preceding section -- to mean those costs proximately caused by the underlying crime.

All of this is to say the following: When Congress wrote that the statute of limitations for a violation of §1341 and §1343 would be ten years "if <u>the offense</u> affects a financial institution," it did not mean that the limitations period would be enlarged where the institution settled regulatory and prosecutorial action stemming from <u>the discovery of the offense.</u> If Congress had intended that counterintuitive result, it would have said so more plainly. See <u>The Protection of Deposits and Depositors</u>, <u>supra</u>, 63 Cath. U.L. Rev. at 782 ("[T]he scope of the 'affects' language is necessarily limited to those effects that are reasonably foreseeable. Typically, Congress includes the language of 'directly or indirectly' when it intends for a statute to apply to derivative effects.")(footnote omitted).

4. Perhaps the best evidence that the statute does not apply here is the government's own long-standing failure to use Section 3293(2) (or the similar

sentence-enhancing language in the wire and mail fraud statutes) in circumstances similar to those here.  See Ghavami Br. at 31, 43; Topetzes and Ricciuti, Expanded Use of FIRREA Means New Challenges for Financial Institutions, 27 No. 19 Westlaw J. Del. Corp. 1 (April 1, 2013)("For more than 20 years after its passage, the enforcement provisions of FIRREA were used infrequently.  When they were used, the government generally pursued claims against persons or companies that 'victimized' a financial institution . . . .").   It is hard to imagine that the government chose not to wield such a powerful prosecutorial weapon if, as it now asserts, the language of the statute so plainly supports its position.

5. As to the legislative history of the Act, we demonstrated in our opening brief that FIRREA's criminal provisions were intended to protect banks from being harmed by fraud and not by their own wrongful conduct.  See Ghavami Br. at 37-38.  The government has little to say in response.  It has not unearthed a single citation that suggests that Congress was concerned about protecting banks that defraud others.  Nor can it point to a single passage in the vast legislative history of the Act where Congress, or any individual member of Congress, even remotely suggested that bank settlement agreements were the type of "effect" contemplated by Section 3293(2) This is hardly surprising, since the opposite is surely true.  See, e.g., Christopher M. Matthews, Federal Prosecutors Emerge From Mortgage-Fraud Trial with New Weapon, Wall Street Journal, October 23, 2013, at

18

1 (stating that former Congressman Steve Bartlett, a co-sponsor of FIRREA, believes that Justice Department's recent development of self-affecting theory is inconsistent with the statute's intent; "The kindest thing you could say about this is it's a stretch. . . .  It was never discussed in this context.  Firrea was not designed to be used in this way.").  For these reasons, the Act "hardly speaks with that clarity of purpose which Congress supposedly furnishes courts in order to enable them to enforce its true will."  United States v. Bass, 404 U.S. 336, 346 (1971).

The government also fails to rebut our point that this Court should avoid, if possible, an interpretation of Section 3293(2) that would inexorably lead to the admission of such prejudicial evidence as the settlement and non-prosecution agreements here, which essentially said that the banks admitted guilt based on Defendants' conduct.  The government, citing Old Chief, correctly notes that Congress can draft a criminal statute that clearly contemplates the admission of damaging evidence, and the felon in possession provision at issue there is one such example.  See Gov't Br. at 52-53.  But where there is ambiguity, as here, the Supreme Court teaches that courts should not lightly assume that Congress intended to stack the deck against criminal defendants, but rather should interpret unclear language in a manner that would promote fairness.[6]

---

[6]     See Almendarez-Torres v. United States, 523 U.S. 224 (1998).   The government points out that, insofar as Almendarez-Torres speaks to the definition of an element of an offense, it is an outlier in the Apprendi line of cases and has

6.      Finally, there is at least sufficient ambiguity such that the rule of lenity dictates that the statute be "resolved in favor of the defendant[s]." <u>Bass</u>, 401 U.S. at 348. This is because "legislatures and not courts should define criminal activity," and where, as here, "Congress has not plainly and unmistakably" done so, defendants should receive the benefit of the doubt.  <u>Id.</u> (quotations omitted).

## POINT II

### THE ADMISSION OF PRIOR BAD ACTS
### EVIDENCE WAS PREJUDICIAL ERROR

In our opening brief, we explained that the evidence that Peter Ghavami committed the charged crimes was "thin" and that the court improperly allowed the government to bolster its case by admitting -- under the guise of "background" -- waves of evidence that Ghavami had engaged in alleged misconduct while at JPMorgan.  The government's brief confirms our point.  The government cites very little proof inculpating Ghavami in the counts of conviction, yet recites at length the testimony of more-than-decade-old allegations of uncharged misconduct.

---

been called into question.  <u>See</u> Gov't Br. at 54.  We cited the case, however, for its approach to statutory interpretation, which has continuing vitality, and not for its approach to the Sixth Amendment.  <u>See, e.g.</u>, <u>1256 Hertel Ave. Assoc's, LLC v. Calloway</u>, 761 F.3d 252, 261 (2d Cir. 2014)(citing <u>Almendarez-Torres</u> in interpreting statute).

1.     The government begins by stating that the "complained-of testimony . . . was necessary to complete the story of the charged offenses."  Gov't Br. at 75.  To the government, this means it showed how the conspirators built "trust" through their prior criminal acts, which allowed them to move their corrupt relationship from JPMorgan to UBS.  See id. at 74 (citing United States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009)).

But there was hardly a need to show prior illicit dealings between the individuals to make the point.  After all, Ghavami had worked at JPMorgan for years and developed close relationships with many fellow employees as he rose to a high executive position within that company.   And he had longstanding relationships with the other alleged coconspirators who worked at other banks. This being so, the true purpose of the "background" evidence was not to explain the genesis of a mutually trusting relationship, but to suggest that Ghavami had committed fraud before, and was doing it again.

Notably, there was nothing unusual about the parties' working relationship at UBS that needed explication by reference to prior uncharged crimes.  For example, had Ghavami, a supervisor in the bank, been charged with conspiring with a mail-room employee to commit a fraud, the fact that the two had teamed up to commit similar crimes at a prior company might shed light on the unlikely coupling.  Or if Ghavami had argued that the charged conspiracy was

implausible because he was new to UBS and did not know his co-workers well enough to commit crimes with them, then perhaps the "background" evidence would have been probative to rebut that assertion.  But that was not the case here; Ghavami did not open the door, and he certainly did not claim it would have been unexpected for him to conspire with Heinz or anyone else.[7]

The cases the government cites underscore the point.  For example, in Mercado, 573 F.3d at 141, evidence of prior firearms deals between the defendant and the cooperator was relevant to the drug charges because, among other things, it directly rebutted the defendant's "strenuous[] argu[ment]" that his association with the cooperator "might be nothing more than innocent acts of a friend, and not a knowing participation in a conspiracy."  Unlike here, "the nature of [that] friendship was very much at issue."  Id. at 142. And in United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992), the defendants were present at the drug scene, but

---

[7]     The government's logic begs the following question:  how did the supposed earlier illegal conduct at JPMorgan begin since Ghavami and Heinz had not worked together before they were at that firm?  Any alleged crimes they committed at JPMorgan must have been based on a "mutual trust" they developed by working closely together at that institution.  But if that is true, then it is equally true they could have developed a "mutual trust" at UBS, thus demonstrating that the JPMorgan evidence was unnecessary.  Simply put, people build trust when they spend time together in lawful endeavors.

claimed not to know about the transaction.  By contrast, Ghavami argued that he did not commit a crime -- not that he was unaware that criminal activity was afoot.[8]

For that reason, the evidence likewise fails a Rule 403 analysis because it was not relevant to the issues at trial.  Ghavami's defense was that he focused on municipal swap transactions and was only tangentially involved in bidding reinvestment deals.  He did not claim that his relationships with the conspirators was too superficial to make an unlawful agreement workable.  The government has no answer to this point, other than, once again, to sound the drumbeat of "mutual trust."  In fact, the government cannot point to any defense argument or theory that its prior bad acts evidence conceivably rebuts.  Rather, the government asserts that the background evidence "was necessary to complete the story" that its own cooperators were telling.  See, e.g., Gov't Br. at 75.

2.    The government also claims that the evidence was admissible under Rule 404(b) to prove "knowledge and intent," Gov't Br. at 79, but this, too, is makeweight.  First, Ghavami's defense was, at bottom, "I didn't rig bids, I was busy working on other transactions."  It was not, "I may have agreed to set the

---

[8]    In Mercado, where the argument for admissibility was much stronger than it is here, the case drew a dissent on this very point.  See id. at 144 (Droney, J., dissenting)(for background evidence to be admissible, "some particular aspect of the background or the relationship of mutual trust must be in issue and the proffered evidence must be particularly relevant to that issue").  Again, there was no "particular aspect of the background" or issue of "mutual trust" that was in dispute here.

price for bids, but I didn't do it on purpose or with criminal intent."[9]   The government also states that Defendants "continue to [argue intent] in this appeal," but it supports this assertion with a quote from our brief in which we argued that the evidence as to Ghavami was "thin."   The evidence was thin, but not because Ghavami disclaimed criminal intent.   It was thin because the government supplied scant proof that Ghavami participated in the charged crimes.

Second, the disputed evidence was not admitted to prove intent, and the jury could not consider the evidence for that purpose.   The government quibbles about whether the court excised "motive" or "intent" from the draft jury instructions, but the court explicitly acknowledged during the conference that the government was not arguing that the evidence "[a]ssists with intent." (A1338). The court made the point clear when it instructed the jury that "[t]his evidence was admitted for a limited purpose only, that is to the extent that you find it explains the background of the relationship between the brokers at CDR on the one hand, and Ghavami and Heinz on the other, for example, whether or not mutual trust existed among them, and whether or not they entered into the relationships with ease and speed and understood one another's remarks.   You may consider the

---

[9]   The only conceivable evidence the government can point to is that Ghavami claimed that he did not realize that the one bid document he signed (related to the Columbia College deal) contained an allegedly false certification.  Gov't Br. at 79. The evidence was clear, though, that Ghavami -- who did not sign any other bid documents -- made an exception because Zaino (who was not authorized to sign) presented the document to Ghavami for signature.  GX-3-8 (A1526).

evidence for that purpose only." (A1383) (emphasis added). As such, the government should not be heard now to claim that the evidence went to "intent." Compare Mercado, 573 F.3d at 141 (prior firearms transactions "was relevant and highly probative as to knowledge and intent, both of which were disputed")(emphasis added).

      3.    The government further asserts that the prior bad acts, such as "flipper trades" and "back-to-back transactions," were no more serious than what was charged in the indictment. Gov't Br. at 82. But as discussed in our opening brief, these were different crimes and, according to the government, wildly more successful than the charged offenses. For example, the so-called "flipper trades" generated a profit to JPMorgan of approximately $25 to $30 million, (A1266), which is multiples of what any of the allegedly rigged bids yielded.

      It also bears note that prior uncharged crimes such as these are particularly difficult to disprove. These crimes were committed 13 or more years before trial and were recounted by cooperators in great generalities and with little or no documentary evidence to back them up. Alex Wright testified in conclusory fashion about daily meetings at JPMorgan where collusion was openly discussed, and about an alleged corrupt relationship between Ghavami and brokers at CDR; Douglas Goldberg talked generally about giving "last looks" to Ghavami between five and ten times when Ghavami was at JPMorgan; and David Rubin testified in

similarly general form about "flipper trades" and other unlawful deals. See Ghavami Br. at 46-49. As difficult as it is for a defendant to challenge evidence of charged offenses, at least the indictment, discovery rules, temporal proximity and the requirement that the evidence meet the elements of the offense allow for a degree of specificity and notice, and provide an opportunity for focused rebuttal and cross-examination. But what occurred here left Ghavami with little opportunity to discredit the witnesses.

        4.    Finally, the government's own proof as to Count 3 -- in which Ghavami and others were charged with conspiring with Doug Campbell at Bank of America on the Commonwealth of Massachusetts deal -- undermines its position. According to the government, that deal involved over $600 million in securities and yielded the biggest profit of all the charged conduct ($4.2 million). In the government's view, although Campbell and Ghavami had not engaged in corrupt deals previously, they quickly became partners in crime. Tellingly, the government must believe that a "mutual trust" developed between these businesspeople -- even though they never worked together -- sufficient to allow them to rig one of the biggest bids of all.

*   *   *

        In sum, the nature and volume of the "background evidence" of prior bad acts that was admitted here poisoned the trial and caused reversible error.

26

# POINT III

## THE ADMISSION OF LAY TESTIMONY INTERPRETING CONSENSUAL RECORDINGS WAS PREJUDICIAL ERROR

In our opening brief, we argued that the district court erred in allowing Alex Wright to interpret two taped calls to which he was not a party. In response, the government purports to apply this Court's opinion in United States v. Yannotti, 541 F.3d 112 (2d Cir. 2008), but its analysis is not faithful to that case.

The government spends much of its argument addressing Mark Zaino's testimony, stating that it "easily" meets Yannotti's first requirement that it be "rationally based on the perception of the witness." Id. at 125. The government writes that Zaino interpreted (i) "his own use" of "code words" and (ii) "certain words used by other co-conspirators . . . based . . . on his personal experience using those terms in the context of the charged conspiracy." Gov't Br. at 84. Ultimately, the government segues to our contention by claiming that "Wright's testimony about recorded calls between Ghavami and Shlomi Raz was similarly permissible." Gov't Br. at 90. Although the government mischaracterizes the Zaino evidence (as Defendant Welty's brief points out), it fails to identify anything allegedly "similar[]" in Wright's testimony.

To begin with, Wright did not address "his own use" of "code words," but testified about what he believed others meant by certain words ("happy," "favor" and "check-away"). Moreover, Wright did not testify that he had used any

27

of those words during the conspiracy.  In fact, there is no evidence that Wright <u>ever</u> used "happy" or "favor" as code, and his use of the term "check-away" referred to a deal that had nothing to do with "the charged conspiracy."

Finally, the government claims that Wright "merely explained the general industry understanding of [the] term" "check-away" and did not "ascribe any special or nefarious meaning to it."  Gov't Br. at 91.  This claim is disingenuous at best.  As discussed in our opening brief, Wright's testimony about a non-competitive check-away can be read only to imply that Ghavami was using the term to refer to an illicit deal.  For these reasons, and those discussed in our opening brief, Wright's testimony was not admissible under Fed. R. Evid. 701.

## POINT IV

### THE DISTRICT COURT ERRED IN
### DENYING THE MOTION FOR A NEW TRIAL

Peter Ghavami respectfully joins the brief of co-Defendant Michael Welty seeking a new trial based on the government's failure timely to disclose evidence.

## **<u>CONCLUSION</u>**

For the reasons stated above and in our opening brief, Peter Ghavami's conviction should be reversed.

Dated:  New York, New York
        December 17, 2014

                                        BALLARD SPAHR STILLMAN
                                        & FRIEDMAN LLP

                                        By:    /s/ Nathaniel Marmur
                                               Nathaniel Z. Marmur
                                               425 Park Avenue
                                               New York, NY 10022
                                               Tel.: (212) 223-0200
                                               Fax: (212) 223-1942
                                               marmurn@bssfny.com

                                        *Attorneys for Defendant-Appellant*
                                          *Peter Ghavami*

Of Counsel:
    Charles A. Stillman
    James A. Mitchell
    Mary Margulis-Ohnuma

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☑  this brief contains     6,824     words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    ☐  this brief uses a monospaced typeface and contains   [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☑  this brief has been prepared in a proportionally spaced typeface using [    Microsoft Word    ] in [ 14 point Times New Roman   ], *or*

    ☐  this brief has been prepared in a monospaced typeface using [ state name and version of word processing program ] with [ state number of characters per inch and name of type style ].

(s)   Nathaniel Marmur
_____

Attorney for   Peter Ghavami
_____

Dated:   12/17/2014
_____